**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

TAMMY VIETEN,

*On Behalf of Herself and All Others Similarly Situated,*

Plaintiff,

v.

THE HUMANE SOCIETY OF THE UNITED STATES,

1255 23rd Street NW, Suite 450
Washington, DC 20037

Defendant.

**Case No. 20-CV-899**

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

**INJUNCTIVE RELIEF SOUGHT**

Plaintiff Tammy Vieten ("Plaintiff" or "Ms. Vieten"), individually and on behalf of all other persons similarly situated, and through her attorneys of record, alleges the following against Defendant The Humane Society of the United States ("Defendant" or "HSUS") based upon personal knowledge with respect to herself and on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters.

**INTRODUCTION**

1. In or around August of 2018, Ms. Vieten made a donation to either HSUS or a local Humane Society chapter.

2. Approximately six months later, in or around February 2019, Ms. Vieten began receiving automated text messages from HSUS. These texts were sent by HSUS to Ms. Vieten at least once a week.

3. After two weeks of receiving these unsolicited text messages, Ms. Vieten began replying to the HSUS text messages, requesting that HSUS stop sending her text messages. On approximately 12 occasions, Ms. Vieten responded with some variant of "Stop," "Stop It," and/or "Opt Out."

4. Unfortunately, HSUS did not honor Ms. Vieten's requests and persisted in sending unsolicited text messages. Thus, beginning in October 2019, Ms. Vieten, as described below, contacted HSUS via email and telephone to put a stop to the unsolicited text messages. Despite multiple assurances from representatives of HSUS that she would no longer be contacted, the text messages continue unabated and HSUS now ignores Ms. Vieten's calls.

5. Defendant's text messages invaded Ms. Vieten's privacy and subjected her to aggravation. This aggravation was exacerbated by Defendant's persistent refusal to address her repeated inquiries regarding the unauthorized text messages she received.

6. By sending unauthorized text messages to Ms. Vieten and similarly situated individuals, HSUS violated federal law and caused them concrete harm, not only in the form of the frustration and invasion of privacy, but also in the form of payments made to cell phone service providers for the receipt of such wireless SPAM.

7. Accordingly, Ms. Vieten brings this class action complaint for damages, injunctive relief, and any other available legal or equitable remedies resulting from the illegal actions of HSUS in sending text messages to Plaintiff and the Class (as defined below) on their cellular telephones, in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq*. ("TCPA").

**PARTIES**

8. Ms. Vieten is a citizen of the state of Florida, and at all relevant times has resided in Port Saint Lucie, Florida.

9. HSUS is a non-profit corporation incorporated in the State of Delaware with its headquarters and principal place of business in Washington, District of Columbia.

**JURISDICTION AND VENUE**

10. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members, and minimal diversity exists because many putative class members are citizens of a different state than Defendant.

11. This Court also has federal question jurisdiction over this case pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the Constitution, laws, or treaties of the United States, specifically Defendant's violation of the TCPA.

12. This Court has personal jurisdiction over HSUS as it has its principal place of business in the District of Columbia and regularly transacts business in the District of Columbia.

13. Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because Defendant maintains its principal place of business in this District, and substantial parts of the events or omissions giving rise to the claims occurred in or emanated from this District, including, without limitation, decisions made by Defendants' governance and management personnel or inaction by those individuals that led to violations alleged herein.

## **COMMON FACTUAL ALLEGATIONS**

### **The TCPA**

14. The TCPA exists to prevent communications like the ones described in this Complaint. "Voluminous consumer complaints about abuses of telephone technology—for example, computerized calls dispatched to private homes—prompted Congress to pass the TCPA." *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 744 (2012).

15. Congressional committees investigating the use of telecommunications technology found that legislation was necessary to prevent abusive telemarketing practices and protect consumers from invasions of privacy, harassment, and economic harm. The Senate Committee on Commerce, Science, and Transportation found that "the Federal Communications Commission (FCC) received over 2,300 complaints about telemarketing calls" in the year preceding the TCPA's passage, stating *inter alia* that "unsolicited calls placed to . . . cellular . . . telephone numbers often impose a cost on the called party (. . . [where, e.g.] cellular users must pay for each incoming call . . .)." *See* S. Report No. 102-178, 1991 U.S.C.C.A.N. 1968, 1991 WL 211220 at *2 (Oct. 8, 1991). The House Committee on Energy and Commerce concurred, finding that "expert testimony, data, and legal analyses comprising the Committee's record, and broad support of consumers, state regulators, and privacy advocates clearly evidence that unsolicited commercial telemarketing calls are a widespread problem and a federal regulatory solution is needed to protect residential telephone subscriber privacy rights." H.R. Report No. 102-317, 1991 WL 245201 at *18 (Nov. 15, 1991).

16. When it passed the TCPA, Congress intended to provide consumers a choice as to how telemarketers may contact them and found that "[t]echnologies that might allow consumers to avoid receiving such calls are not universally available, are costly, are unlikely to be enforced, or place an inordinate burden on the consumer." Pub. L. No. 102–243, § 11. Congress also found that "the evidence presented to the Congress indicates that automated or prerecorded calls are a nuisance." *Id.* §§ 12-13.

17. The TCPA's ban on telephone calls made using an automatic telephone dialing system ("ATDS" or "autodialer"), as defined by 47 U.S.C. § 227(a)(1), has been interpreted to extend to

unsolicited autodialed text messages sent to cellular phones. *See, e.g.*, FCC Declaratory Ruling, 27 F.C.C.R. 15391, 2012 WL 5986338 (Nov. 29, 2012); *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 667 (2016) ("A text message to a cellular telephone, it is undisputed, qualifies as a 'call' within the compass of [the TCPA].").

**HSUS Sends Unsolicited Text Messages En Masse to Cellular Phones**

18. HSUS spends an inordinate portion of the funds it collects from donors such as Ms. Vieten on fundraising and marketing, rather than on programs actually purporting to fulfill its mission.

19. Charity Navigator, the nation's largest and most-utilized evaluator of charities, gives HSUS only one star (out of four) for its financial performance metrics. According to Charity Navigator, HSUS spends only 65.8% of its expenses on program expenses and 34% on fundraising and administrative expenses.[1] Similarly, in 2012, the independent organization Charity Watch gave "HSUS a D in large part because so much of every dollar donated goes to raise more money."[2] The numbers are even worse when considering the funds raised on behalf of HSUS by professional fundraisers. According to the "Pennies for Charity" report issued by the New York State Attorney General, of the $1.95 million raised in 2008 for HSUS by professional fundraisers, only 5.29% went to HSUS. The average return for charities in the report was 39.5%.[3]

20. Among the fundraising and marketing campaigns that HSUS runs are text-message campaigns.

---

[1] *The Humane Society of the United States*, Charity Navigator, https://www.charitynavigator.org/index.cfm?bay=search.summary&orgid=3848 (last visited March 31, 2020).

[2] Jayne O'Donnell, *BBB's charity ratings, seal of approval under fire*, USA Today (Dec. 27, 2012), https://www.usatoday.com/story/money/personalfinance/2012/12/27/better-business-bureau-charity-ratings-donations/1636957/.

[3] *Pennies for Charity: Where Your Money Goes*, N.Y. State Department of Law Charities Bureau (Oct. 2009), *available at* https://www.charitiesnys.com/pdfs/2009_Pennies.pdf.

21. HSUS relies on text messages to reach thousands of "constituents" across the United States.[4]

22. HSUS has relied on text messaging since 2007, with the content of messages including "advocacy opportunities, event invites, breaking animal news, . . . polls and trivia, and . . . donation appeals."[5]

23. HSUS builds its text messaging contact list through a variety of means, including from persons who previously donated to HSUS or who signed an online petition.[6]

24. HSUS sends its text messages using short codes, including the short code 30644. A short code is a special number used for text messages sent to cellular subscribers. Short codes are unique 5- or 6-digit numbers that are obtained from an independent agency that manages and assigns these numbers in the United States. Organizations generally use short codes to communicate with large numbers of cellular subscribers.

25. These text messages come in the form of Short Message Services. The term "Short Message Service" or "SMS" describes a messaging system that allows cellular telephone subscribers to use their cellular telephones to send and receive short text messages, usually limited to 160 characters.

26. An "SMS message" is a text message directed to a wireless device through the use of the telephone number assigned to the device. When an SMS message is successfully made, the recipient's cell phone alerts the recipient that a text message is being received.

---

[4] *The Humane Society of the United States*, Great Nonprofits, https://greatnonprofits.org/reviews/the-humane-society-of-the-united-states/role:4/page:1 (last visited March 30, 2020).
[5] *Response to Fundraising Texts Surpass Email Appeals*, The NonProfit Times (May 14, 2018), https://www.thenonprofittimes.com/npt_articles/response-fundraising-texts-surpass-email-appeals/.
[6] *Humane Society of the United States*, Upland Software, https://uplandsoftware.com/mobile-messaging/resources/case-study/humane-society-of-the-united-states/ (last visited March 30, 2020) ("The mobile list was built primarily from sign-ups through online advocacy campaigns, such as ending the Canadian seal hunt and stopping puppy mills.")

27. Upon information and belief, HSUS used a combination of hardware and software systems to send the text messages at issue in this case. The systems used by HSUS have the capacity to generate or store random or sequential numbers or to dial sequentially or randomly at the time the text message is sent, and to dial such numbers, en masse, in an automated fashion and without human intervention.

28. The systems used by HSUS to transmit the subject text messages also stores numbers and dials them automatically, sending text messages to a stored list of phone numbers as part of scheduled campaigns.

29. The impersonal and generic nature of Defendant's text messages, *see* Exhibit A,[7] demonstrates that HSUS used an ATDS in transmitting the messages.

30. HSUS sent the text messages via an ATDS or autodialer as defined by 47 U.S.C. § 227(a)(1). The ATDS has the capability to both (1) store or produce telephone numbers to be texted using a random or sequential number generator, and (2) automatically send text messages from a list or database of telephone numbers, without human intervention.

31. HSUS has a policy of using an ATDS to text individuals, just as it did to Plaintiff's cellular telephone in this case.

32. As noted above, Plaintiff did not consent to receive text messages and in fact repeatedly requested that Defendant stop sending them to her. Further, upon information and belief, other putative class members did not consent to receiving text messages from an autodialer.

33. Defendant's text messages were intentionally sent to Plaintiff and other members of the Class. On information and belief, HSUS is well aware of TCPA's prohibitions against use of autodialers in unsolicited calls and text messages to consumers but made the business decision to send these text messages anyway.

---

[7] **Exhibit A** are photographs of a recent unauthorized text message that Plaintiff Vieten received from HSUS. *See also [RESEARCH] Is Your Nonprofit Utilizing Text Alerts?*, Nonprofit Tech 2.0 (June 17, 2013), https://nonprofitorgs.wordpress.com/2013/06/17/research-is-your-nonprofit-utilizing-text-alerts/ (displaying screenshot of HSUS text message).

**Plaintiff Tammy Vieten Received Multiple Unauthorized Text Messages from Defendant**

34. In or around August of 2018, Ms. Vieten made a donation to either HSUS or a local Humane Society chapter.[8] She did not know at the time that her donation would set her up for months of non-stop unsolicited text messages from HSUS.

35. In or around February 2019, Ms. Vieten began receiving text messages from HSUS of the type described above in paragraph 19. Some of these messages included images of animals in cages or chains. These text messages were sent by HSUS to Ms. Vieten at least once a week from a short code number.

36. After two weeks of receiving these unsolicited text messages, Ms. Vieten began replying to the HSUS text messages, requesting that HSUS stop texting her. On approximately 12 occasions since February 2019, Ms. Vieten responded with some variant of "Stop," "Stop It," and/or "Opt Out."

37. Unfortunately, HSUS did not honor Ms. Vieten's requests and persisted in sending unsolicited text messages, including as recently as March 27, 2020. Moreover, these text messages did not include a link or a number to call to stop the messages. *See* Exhibit A.

38. Thus, beginning in October 2019, Ms. Vieten tried other methods to stop the unsolicited text messages. That month, she visited the HSUS website, found contact information for HSUS, and contacted HSUS via telephone at the number listed on Defendant's website: (202) 452-1100.[9] The HSUS representative who answered the phone informed Ms. Vieten that her information was on the HSUS contact list and they assured Ms. Vieten that she would be removed from the list.

39. Despite these assurances, the text messages continue unabated and HSUS continued to send Ms. Vieten unsolicited text messages on at least a weekly basis.

---

[8] Ms. Vieten used her married name, Tammy Cunningham, for this donation and she is listed as "Tammy Cunningham" in HSUS's systems.

[9] *Contact Us*, Humane Society of the United States, https://www.humanesociety.org/contact-us (last visited March 30, 2020).

40. Ms. Vieten followed up with an email to HSUS on October 30, 2019 with the subject line "Please remove number."[10]

41. Ms. Vieten did not receive a response to her October 30, 2019 email. Instead, HSUS continued to send Ms. Vieten unsolicited text messages on at least a weekly basis.

42. In or about November or December 2019, Ms. Vieten again called HSUS at (202) 452-1100 and requested to speak with a supervisor. An HSUS representative named Jennifer apologized for the text messages and informed Ms. Vieten that she would be removed from HSUS's contact list.

43. Unfortunately, Jennifer's statements proved false. HSUS continued to send Ms. Vieten unsolicited text messages on at least a weekly basis.

44. On or about December 3, 2019, Ms. Vieten contacted HSUS through its website, providing her name, email address, physical address, and phone number along with the following message: "I have asked three times for my number to be removed from ALL texting. I must get a text per week from Ellen@HSUS and have asked AGAIN to be removed!" An HSUS Membership and Donor Care Representative named Chris responded on behalf of HSUS, writing "We appreciate you letting us know that you prefer not to receive text-message updates about our animal protection work." But HSUS did not agree in that email to remove Ms. Vieten from its text message list, instead directing her to "simply reply 'STOP' to any of our text messages."[11]

45. This direction was, to put it mildly, unhelpful. Ms. Vieten had already replied "STOP" on several occasions in response to HSUS's unsolicited text messages.

46. Ms. Vieten continued receiving unsolicited text messages from HSUS after this December 2019 exchange. And HSUS continued to ignore Ms. Vieten's replies to these text messages requesting that HSUS stop texting her.

---

[10] **Exhibit B** is a copy of the October 30, 2019 email from Ms. Vieten to donorcare@humanesociety.org.
[11] **Exhibit C** is a copy of the December 2019 email exchange between Ms. Vieten and HSUS.

47. In January or early February 2020, Ms. Vieten again contacted HSUS in an attempt to get HSUS to remove her from its text messaging list. She called (866) 720-2676, the other number on HSUS's contact page, and spoke with an HSUS supervisor named Adam. Adam informed Ms. Vieten that he saw her name on HSUS's contact list and assured her that it would be removed.

48. Yet again, HSUS's assurances were false. Ms. Vieten is still receiving unsolicited text messages from HSUS to this day.

49. Since that January 2019 phone call, Ms. Vieten has tried on several occasions to call HSUS at (202) 452-1100 regarding HSUS's continued transmission of unsolicited text messages. HSUS now simply hangs up on Ms. Vieten when she calls.

50. It has been over a year since Ms. Vieten first informed HSUS that she did not consent to receive text messages from HSUS.

51. The automated text messages that HSUS sent (and continues to send) to Ms. Vieten were to a phone number for which Ms. Vieten is charged for incoming calls and text messages pursuant to 47 U.S.C. § 227(b)(1)(A)(iii). The last four digits of Ms. Vieten's phone number are "1707."

52. The automated text messages that HSUS sent (and continues to send) to Ms. Vieten originated from telephone number 30644, a number which upon information and belief is owned and operated by Upland Software, Inc. ("Upland"), a company that provides its customers, including HSUS, with an "easy-to-use dashboard" that allows Upland's customers "to launch an automated messaging campaign."[12]

53. Upland refers to this offering used by HSUS as "Upland Mobile Messaging." Upland created this offering by "combin[ing] three industry-leading mobile messaging solutions – Mobile Commons, Hipcricket, and Waterfall to create the leading enterprise-grade, end-to-end mobile

---

[12] *Why Upland Mobile Messaging*, Upland Software, https://uplandsoftware.com/mobile-messaging/our-advantage/why-mobile-messaging/ (last visited March 30, 2020).

engagement solution, transforming the way that enterprise marketers communicate with consumers."[13]

54. The Hipcricket privacy policy, available on Upland's website, acknowledges that "[t]ext messages are sent by Hipcricket using an autodialer."[14]

55. Terms and conditions hosted on Waterfall's now-defunct website for consumers receiving text messages on behalf of The Gap, Inc., via Upland's platform require consumers to "agree to receive autodialed or prerecorded recruiting mobile messages at the phone number associated with your opt-in."[15]

56. Plaintiff did not consent to receive autodialed or prerecorded mobile messages to her cellular telephone, and even if such "consent" was surreptitiously obtained, it was revoked in February 2019.

57. Upon information and belief, members of the Class did not consent to receive autodialed or prerecorded mobile messages to their cellular telephones. To the extent they consented to receive text messages, such consent did not extend to autodialed or prerecorded mobile messages.

58. Plaintiff alleges that the unsolicited text messages she received from HSUS violated 47 U.S.C. § 227(b)(1).

## CLASS ACTION ALLEGATIONS

59. Pursuant to Fed. R. Civ. P. 23(a), (b)(1), (b)(2) and (b)(3), as applicable, Plaintiff seeks certification of the following nationwide class (the "Class"):

> All persons within the United States who, within the four years prior to the filing of this Complaint, were sent a text message from Defendant or anyone on Defendant's behalf, to said person's cellular telephone number, without emergency purpose and without the recipient's valid express consent.

---

[13] *Hipcricket Platform*, Upland Software, https://uplandsoftware.com/mobile-messaging/hipcricket/ (last visited March 31, 2020).
[14] *Hipcricket Privacy Policy*, Upland Software (April 12, 2017), https://uplandsoftware.com/mobile-messaging/hipcricket-privacy-policy/.
[15] *Text Message Program Terms & Privacy Policy*, Upland Software (January 2019), https://cs.waterfall.com/gap/terms/.

60. Excluded from the Class are Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class are any judicial officer presiding over this matter, members of their immediate family, and members of their judicial staff, and any judge sitting in the presiding court system who may hear an appeal of any judgment entered.

61. Plaintiff reserves the right to amend or modify the Class definition with greater specificity or division after having had an opportunity to conduct discovery.

62. The Class meets the criteria for certification under Rule 23(a), (b)(1), (b)(2), (b)(3) and (c)(4).

63. **Risk of Inconsistent or Varying Adjudications. Fed. R. Civ. P. 23(b)(1).** As the proposed class members include thousands of persons across all 50 states, there is significant risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the Defendant. For example, injunctive relief may be entered in multiple cases, but the ordered relief may vary, causing the Defendant to have to choose the court order with which it will comply.

64. **Numerosity. Fed. R. Civ. P. 23(a)(1).** Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that the joinder of all members is impractical. While the exact number of class members is unknown to Plaintiff at this time, it is believed that the Class is comprised of thousands of members geographically dispersed throughout the United States. Affected consumer's names and addresses are available from HSUS's records, and class members may be notified of the pendency of this action by recognized, court-approved notice dissemination methods, which may include electronic mail, U.S. Mail, internet notice, and/or published notice.

65. **Predominance of Common Issues. Fed. R. Civ. P. 23(a)(2) and (b)(3).** Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual class members. The common questions include:

  a. Whether Defendant's conduct violates the TCPA;

  b. Whether Defendant's text messages were sent using an ATDS;

  c. Whether Defendant's text messages were sent for an emergency purpose;

  d. Whether Defendant obtained valid express consent from the automated text message recipients;

  e. Whether Defendant honored requests from recipients to be removed from its contact list(s);

  f. Whether Plaintiff and members of the Class are entitled to damages, costs, or attorneys' fees from Defendant;

  g. Whether Defendant's conduct caused Plaintiff and members of the Class inconvenience or annoyance;

  h. Whether Plaintiff and members of the Class are entitled to compensatory damages;

  i. Whether Plaintiff and members of the Class are entitled to treble damages based on the willfulness of Defendant's conduct;

  j. Whether, as a result of Defendants' conduct, Plaintiff and members of the Class are entitled to injunctive, equitable, declaratory and/or other relief, and, if so, the nature of such relief.

  66. **Typicality. Fed. R. Civ. P. 23(a)(3).**  Plaintiff's claims are typical of other Class members' claims because Plaintiff and Class members were subjected to the same unlawful conduct and damaged in the same way. Defendant's conduct that gave rise to the claims of Plaintiff and other Class members (i.e., using an autodialer to send unsolicited text messages to cellular phones owned by Plaintiff and members of the Class) is the same for all Class members.

  67. **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter against Defendant to obtain relief for the Class. Plaintiff has no conflicts of interest with the Class. Plaintiff's counsel are competent and experienced in litigating class actions, including extensive experience in litigating TCPA claims. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the interests of the Class.

68. **Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs and class members may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Class members are relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each Class member would also strain the court system. Moreover, individual litigation creates the potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

69. **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole. Moreover, Defendant continues to send unsolicited text messages to Plaintiff and Class members using an autodialer, thus making injunctive and declaratory relief a live issue and appropriate to the Class as a whole.

**COUNT 1**

**VIOLATION OF THE TELEPHONE CONSUMER PROTECTION ACT,**

*47 U.S.C. § 227 et seq.*

Against Defendant on Behalf of Plaintiff and the Class

70. Plaintiff incorporates by reference all above paragraphs as if fully alleged herein.

71. Plaintiff and the members of the Class are, and at all times mentioned herein were, "person(s)" as defined by 47 U.S.C. § 153(39).

72. The text messages that HSUS sent were not for an emergency purpose as defined by 47 U.S.C. § 227(b)(1)(A)(i).

73. The text messages from HSUS also constitute artificial or prerecorded calls pursuant to 47 U.S.C. § 227(b)(1).

74. Defendant utilized and utilizes an ATDS system to send artificial or prerecorded text messages to Plaintiff's and Class members' cell phone numbers as defined by 47 U.S.C. § 227(a)(1) and in violation of 47 U.S.C. § 227(b)(1)(A)(iii).

75. Under the TCPA, HSUS has the burden to demonstrate that Plaintiff and each member of the Class gave prior express *written* consent to receive autodialed telemarketing texts to their cellular phones. *See 2008 ACA Declaratory Ruling*, 23 FCC Rcd at 565, ¶ 10.

76. Plaintiff never authorized Defendant to send her text messages of any kind and, in the alternative, if such consent was provided, it was revoked in February 2019.

77. Members of the Class did not consent to receive autodialed or prerecorded mobile messages to their cellular telephones. To the extent they consented to receive any text messages, such consent did not extend to autodialed or prerecorded mobile messages.

78. Plaintiff and Class members received autodialed, non-emergency text messages despite the fact that they did not provide HSUS with consent, written or otherwise, or had revoked such consent to send autodialed text messages to their cellular phones.

79. As detailed above, Defendant has violated 47 U.S.C. § 227(b)(1)(A)(iii) and as a direct and proximate result, Plaintiff and the putative Class members are entitled, under section 227(b)(3)(B), to, *inter alia*, a minimum of $500 for each violation.

80. The TCPA further provides for trebling the amount in cases where the violation was committed with actual or constructive knowledge. Here, Defendant knew or should have known that Plaintiff and Class members did not consent to the receipt of unsolicited text messages. Defendant's own records will show that Plaintiff and Class members did not consent to receive text messages from HSUS or that Plaintiff and Class members had revoked such consent.

81. To the extent Defendant knew or should have known that Plaintiff and the Class members did not provide prior express consent to receive text messages from HSUS or had revoked such consent, the court should, pursuant to 47 U.S.C. Section 227(b)(3)(C), treble the amount of statutory damages recoverable by the Plaintiff and the putative Class members.

82. As a result of Defendant's violations of 47 U.S.C. § 227 *et seq.*, Plaintiff and members of the Class have been subjected to nuisance text messages, have been forced to waste time reviewing, deleting, and/or responding to Defendant's unsolicited automated text messages, and have suffered invasions of their privacy and unwanted use of data storage space on their cellular telephones.

83. Plaintiff and members of the Class are also entitled to, and seek, injunctive and declaratory relief prohibiting HSUS's illegal conduct in the future.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all putative Class members, respectfully requests that the Court enter judgment in their favor and against Defendant as follows:

1. For an Order determining at the earliest possible time that this matter may proceed as a class action under Rule 23 and certifying this case as such;

2. For herself and each Class member treble damages, as provided by statute, of up to $1,500.00 for each and every text message that violated the TCPA, as a result of Defendant's willful and/or knowing violations of 47 U.S.C. § 227(b)(1);

3. For herself and each Class member $500.00 in statutory damages for each and every text message that violated the TCPA, as a result of Defendant's violations of 47 U.S.C. § 227(b)(1);

4. For injunctive relief;

5. For reasonable attorneys' fees and costs of suit;

6. For pre-judgment interest; and

7. Such further and other relief the Court deems reasonable and just.

## JURY DEMAND

Plaintiff, on behalf of herself and the Class of all others similarly situated, hereby demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: April 3, 2020

Respectfully submitted,

*/s/ Hassan A. Zavareei*
Hassan A. Zavareei (Bar ID: 456161)
**TYCKO & ZAVAREEI LLP**
1828 L Street NW, Suite 1000
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
Email: hzavareei@tzlegal.com

Melissa S. Weiner*
Joseph C. Bourne*
**PEARSON, SIMON & WARSHAW, LLP**
800 LaSalle Avenue, Suite 2150
Minneapolis, Minnesota 55402
Telephone: (612) 389-0600
Facsimile: (612) 389-0610
Email: mweiner@pswlaw.com
jbourne@pswlaw.com

Jeff Ostrow*
Jonathan M. Streisfeld*
Joshua R. Levine*
**KOPELOWITZ OSTROW**
**FERGUSON WEISELBERG GILBERT**
1 West Las Olas Blvd. Suite 500
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
Facsimile: (954) 525-4300
Email: streisfeld@kolawyers.com
ostrow@kolawyers.com

**pro hac vice* application forthcoming

*Counsel for Plaintiff and the Proposed Class*